UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JUDGE SULLIVAN          11 CIV 5837



| | |
|---|---|
| EL TEPEYAC GROCERY INC and MARINA GARCIA 1621 Lexington Ave, Front 2, New York, N.Y.  )<br>)<br>)<br>)<br>) | |
| Plaintiff,  )<br>) | |
| v.  )<br>)<br>) | Civil Action No. _____ |
| UNITED STATES OF AMERICA  )<br>)<br>) | |
| and  )<br>)<br>) | |
| TOM VILSACK Secretary of Agriculture 1400 Independence Avenue, S.W. Washington, D.C.  20250,  )<br>)<br>)<br>)<br>)<br>) | |
| Defendants.  )<br>) | |

### COMPLAINT FOR
### DECLARATORY AND OTHER RELIEF

Plaintiff EL TEPEYAC GROCERY INC and Plaintiff MARINA GARCIA, for their

complaint against defendants United States of America and Tom Vilsack, Secretary of

Agriculture, allege as follows with all allegations stated upon information and belief:

### NATURE OF ACTION

1.  Plaintiff MARINA GARCIA, the owner of Plaintiff EL TEPEYAC GROCERY

INC, a small food store, has herself been charged with no wrongful conduct, but will be

disqualified for a period of six months from participation in the federal food stamp program if

the determination made by the Secretary of Agriculture is permitted to stand. Plaintiffs bring this

action pursuant to 7 U.S.C. § 2023(a)(13)-(17) to set aside that determination. Pursuant to 7 U.S.C. § 2023(a)(15), this action is a "trial de novo" in which "the court shall determine the validity of the questioned administrative action in issue." Plaintiff also challenges the constitutionality and validity of certain administrative procedures governing the disqualification of stores that participate in the food stamp program.

2. Approximately 45% of the store's gross receipts are derived from food stamps, which are primarily redeemed through the electronic benefits transfer system. Disqualification for a period of six months would force Plaintiffs out of business, and, as a result, the store's very existence is threatened by the Secretary's action.

3. Moreover, the Plaintiffs store is the sole retailer of ingredients for Mexican home-made recipes, and healthy food products, including, without limitation, fresh fruits and vegetables, serving the lower-income population living in the immediate vicinity of the area of upper Manhattan (East Harlem) in which the store is located. Disqualification for a period of six months would, thus, cause hardship to food stamp households in that area because there is no other authorized retail food store in the area selling as large a variety of staple food items (that is, ingredients for Mexican home-made recipes, and healthy food products) at comparable prices.

### JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 7 U.S.C. § 2023, 28 U.S.C. § 1331, and 5 U.S.C. § 701 *et seq*. An actual controversy exists between Plaintiffs and Defendants, justiciable in character, in respect to which Plaintiffs request a declaration of their rights and appropriate further relief pursuant to the provisions of 28 U.S.C. §§ 2201, 2202, and 1651.

5. Venue is proper in this district pursuant to 7 U.S.C. § 2023(a)(13) and 28 U.S.C. § 1391(e).

## PARTIES

6. Plaintiff MARINA GARCIA ("Ms. Garcia") through Plaintiff EL TEPEYAC GROCERY INC ("El Tepeyac Grocery") is engaged in the retail sale of food products in East Harlem, New York, an area also known as Spanish Harlem and El Barrio, a section in Harlem in the northeastern part of the New York City borough of Manhattan. East Harlem is one of the largest predominantly Latino communities in New York City. Ms. Garcia speaks only Spanish.

7. The United States of America is a named defendant pursuant to 7 U.S.C. § 2023(a)(13).

8. Defendant Tom Vilsack, Secretary of Agriculture (the "Secretary"), has responsibility for the Department of Agriculture, a subdivision of which is the Food and Nutrition Service. The Food and Nutrition Service (formerly the Food and Consumer Service) administers the federal food stamp program pursuant to authority delegated by the Secretary.

## ALLEGATIONS RELATING TO ALL COUNTS

### A. The Charges

9. Ms. Garcia owns and operates a small food store – El Tepeyac Grocery—at 1621 Lexington Ave. (102nd Street) in East Harlem, New York. Ms. Garcia operates the store with the assistance of her daughter, Griselda Garcia, who was maintaining the store with assistance of 5 employees during the time material to this action.

10. As a result of El Tepeyac Grocery's location in East Harlem, a low-income neighborhood, a substantial percentage of its sales -- 45% -- are paid for with benefits from the federal food stamp program, which provides assistance to persons below a certain income level. Food stamp recipients were formerly issued coupons that could be used to purchase food items. The use of coupons in the New York metropolitan area has been almost entirely replaced by the issuance of electronic benefit cards (automated debit cards) to food stamp recipients.

- 3 -

11. The 2008 farm bill (H.R. 2419, the Food, Conservation, and Energy Act of 2008) changed the name of the Federal program to the Supplemental Nutrition Assistance Program or SNAP as of Oct. 1, 2008, and changed the name of the Food Stamp Act of 1977 to the Food and Nutrition Act of 2008.

12. A retail store in the food stamp program violates the Secretary's regulations if it accepts coupons or electronic benefits in exchange for cash or items other than eligible food. 7 C.F.R § 278.2(a).

13. In May of 2011, Ms. Garcia received a letter from the Food and Nutrition Service ("FNS"), the subdivision of the Department of Agriculture that administers the SNAP program. The letter, which was dated May 11, 2011, and the enclosed, redacted investigative report, charged El Tepeyac Grocery with accepting SNAP benefits in exchange for merchandise which, in addition to eligible foods, included common non-food items in violation of 7 C.F.R. § 278.2(a).

14. The enclosed redacted investigative report stated that a male employee had done the following: (a) on March 8, 2011, had accepted SNAP benefits in the amount of $16.18 in exchange for merchandise which, in addition to five eligible food items, included three common non-food items (soap, dish soap and a sponge) from an undercover agent who had purchased the items with an electronic benefits card; (b) on March 11, 2011, had accepted SNAP benefits in the amount of $12.14 in exchange for merchandise which, in addition to five eligible food items, included three common non-food items (soap, fabric softener and laundry detergent) from an undercover agent who had purchased the items with an electronic benefits card; (c) on March 14, 2011, had accepted SNAP benefits in the amount of $14.52 in exchange for merchandise which, in addition to five eligible food items, included three common non-food items (a spoon, ajax

cleanser and trash bags) from an undercover agent who had purchased the items with an electronic benefits card, in violation of 7 C.F.R. § 278.2(a).

15. The enclosed redacted investigative report stated that a female employee had done the following: on 2 separate dates in March, had accepted SNAP benefits in the amount of $14.52 and $4.93 in exchange for merchandise which included only eligible food items from an undercover agent who had purchased the items with an electronic benefits card, and when the undercover agent asked her to exchange SNAP benefits for cash, she refused to do so.

16. The offense charged as per the redacted investigative report due to the acts of the male employee, that is, exchanging benefits for non-food items, is a less serious infraction than exchanging benefits for cash, which constitutes "trafficking" (which the female employee of Tepeyac Grocery, when pressed by the undercover investigator, refused to do).

17. The buying or selling of food stamp coupons or electronic benefits for cash or consideration other than eligible food is known as "trafficking," 7 C.F.R. § 271.2, and is prohibited.

18. The charging letter did not allege that the Plaintiffs had been involved in trafficking.

19. Under the provisions of the Food Stamp Act, as amended, 7 U.S.C. § 2011 *et seq.*, store owners who are entirely unaware of their employees' unauthorized illegal acts are held strictly liable for those acts and are subject to all applicable penalties. The letter stated that the cited violations "warrant a disqualification period of 6 months" pursuant to C.F.R. § 278.6(e)5. The letter also informed Ms. Garcia that, under certain conditions, FNS [the Food and Nutrition Service] may impose a civil money penalty (CMP) in lieu of disqualification" pursuant to C.F.R. § 278.6(f)(1).

**B.   The Statutory and Regulatory Scheme**

20.   The controlling statute in this matter is contained in the Food and Nutrition Act of 2008, as amended, 7 U.S.C. § 2021 and 278 of Title 7 of the Code of Federal Regulations (CFR). Sections 7 C.F.R. § 278.6(a) and 7 C.F.R. § 278.6(e)(5) provide the authority upon which a six month disqualification may be imposed against a retail food store or wholesale food concern.

21.   7 C.F.R. § 278.6(a) provides, *inter alia*, "FNS may disqualify any authorized retail food store or authorized wholesale food concern from further participation in the program if the firm fails to comply with the Food Stamp Act of 1977, as amended, or this part. Such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through on-site investigations..."

22.   7 C.F.R. § 278.6(e)(5) states, *inter alia*, "The FNS regional office shall: ... Disqualify the firm for 6 months if it is to be the first sanction for the firm and the evidence shows that personnel of the firm have committed violations such as but not limited to the sale of common nonfood items due to carelessness or poor supervision by the firm's ownership or management..."

23.   However, there is an alternative to a disqualification which, under certain circumstances, may be available to, and preferred by, a firm which evidence shows has committed a violation - a civil money penalty (CMP).

24.   7 C.F.R. § 278.6(f)(1) provides, *inter alia*, "FNS may impose a civil money penalty as a sanction in lieu of disqualification when the firm subject to disqualification is selling a substantial variety of staple food items, and the firm's disqualification would cause hardship to food stamp households because there are no other authorized retail food store in the area selling as large a variety of stable food items at comparable prices."

25.  The regulations require a store accused of trafficking to respond to the charging letter within 10 days of receipt.  The charging letter must inform the store accused of trafficking that its response must include (a) all of the store's evidence in defense of the charges; (b) a request for consideration of a civil money penalty in lieu of permanent disqualification; and (c) evidence that establishes the store's eligibility for a civil money penalty.  7 C.F.R. § 278.6(b)(2)(i)-(iii).

26.  However, in the case where a firm has not been accused of trafficking, rather faces disqualification for "6 months if it is to be the first sanction for the firm and the evidence shows that personnel of the firm have committed violations such as but not limited to the sale of common nonfood items due to carelessness or poor supervision by the firm's ownership or management" [7 C.F.R. § 278.6(e)(5)], the charging letter is only required to indicate that the response due within 10 days of receipt of the letter must include all of the store's evidence in defense of the charge.  7 C.F.R. § 278.6(b)(1).  There is no requirement that the charging letter inform the firm accused of a violation that its response should include (a) a request for consideration of a civil money penalty in lieu of permanent disqualification; and (b) evidence that establishes the store's eligibility for a civil money penalty, as the charging letter in a case of trafficking must do pursuant to 7 C.F.R. § 278.6(b)(2)(i)-(iii).

27.  Moreover, the FNS publishes no materials for stores to use in order to qualify for a civil money penalty in the event of a charge.  Indeed, the FNS does not even notify stores of the requirements for qualifying for a civil money penalty in lieu of a disqualification other than by providing a 70-page compilation of regulations excerpted from the Code of Federal Regulations.  The requirements are buried in the 70 pages.  The owner of a store who does not have an in-house lawyer typically learns of the requirement that there be evidence that "the firm's disqualification would cause hardship to food stamp households because there are no other

authorized retail food store in the area selling as large a variety of stable food items at comparable prices" (7 C.F.R. § 278.6(f)(1)) only when the FNS issues its determination. By then, of course, it is too late to submit evidence showing that the store would qualify for a civil money penalty (CMP) in lieu of a six month disqualification

28. Under 7 U.S.C. § 2021(a), "Any approved retail food store or wholesale food concern may be disqualified for a specified period of time from further participation in the food stamp program, or subjected to a civil money penalty of up to $10,000 for each violation if the Secretary determines that its disqualification would cause hardship to food stamp households, on a finding, made as specified in the regulations, that such store or concern has violated any of the provisions of this chapter or the regulations issued pursuant to this chapter". The Secretary, however, has refused to exercise the discretion mandated by Congress and has promulgated regulations that directly contravene the letter and the spirit of the statutory provision.

29. The Secretary's refusal to exercise the discretion conferred by Congress extends to the civil money penalty itself. Even when this monetary sanction is applied, the formula for assessing it is based solely on the store's legitimate food stamp redemptions, and consequently punishes an innocent owner for doing good business. Under this formula, the Secretary applies a series of arithmetic multipliers designed to guarantee that virtually every owner will incur the statutory maximum penalty of $54,000[*] for a first offense. 7 C.F.R. § 278.6(g)(1)-(3).

---

[*] The statutory amount of $40,000 was increased to $54,000 by The Federal Civil Penalties Inflation Adjustment Act of 1990, as amended. *See* 70 Fed. Reg. 29,573, 29,577 (May 24, 2005); 7 C.F.R. §§ 3.91(b)(3)(ii); 278.6(g).

C.  The Administrative Adjudication Process

30.  A proceeding against a store owner charged with a violation other than trafficking begins with the charging letter from the FNS regional office with responsibility for the store's geographic area.  7 C.F.R.  § 278.6(b)(1).  A redacted version of the investigative report is provided as well.  As stated above, the accused store owner is required to provide a response in 10 days that must include all evidence in opposition to the charge.  7 C.F.R.  § 278.6(b)(1). Unlike in the case of trafficking, there is no requirement that the charge letter inform the firm that they may request a civil penalty and submit evidence supporting a civil monetary penalty (CMP) in lieu of disqualification. 7 C.F.R.  § 278.6(b)(2)(i)-(iii).  Thus, the firm is effectively denied an opportunity to present evidence establishing that "the firms disqualification would cause hardship to food stamp households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices..." , 7 C.F.R.  § 278.6(f)(1).

31.  The charging letter also directs the store owner to serve his response on -- or, alternatively, to meet with -- the "officer-in-charge," an FNS employee located in an FNS field office that is within the region in question.  That officer-in-charge typically makes the initial determination as to whether (a) the alleged violation(s) occurred; (b) the store qualifies for the civil money penalty; and (c) the amount of the civil money penalty, if applicable.  The officer-in-charge then sends the store owner a letter setting forth the determination and the sanction.

32.  Although the Secretary's regulations require the FNS regional office -- or its agent, the officer-in-charge -- to "review" all of the available evidence, 7 C.F.R. § 278.6(c), the process cannot be fairly characterized as an evaluation of the evidence by disinterested arbiter.  Upon information and belief, the officer-in-charge generally relies on the investigative report and finds that a violation occurred.

33. Moreover, although 7 C.F.R. § 278.6(d) provides, *inter alia,* that in making its determination "The FNS regional office making a disqualification or penalty determination shall consider: (1) The nature and scope of the violations committed by personnel of the firm, (2) *Any prior action taken by FNS to warn the firm about the possibility that violations are occurring,* and (3) Any other evidence that shows the firm's intent to violate the regulations" (emphasis added), it is unclear whether consideration number (2) would serve to mitigate the penalty for a firm that has not been warned.

34. In the instant case, for example, the Plaintiffs never received a prior warning about the possibility that violations were occurring.

35. The civil money penalty, which may be substituted for a six month disqualification, is available "as a sanction in lieu of disqualification when the firm subject to a disqualification is selling a substantial variety of staple food items, and the firm's disqualification would cause hardship to food stamp households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices..." , 7 C.F.R. § 278.6(f)(1).

36. The Plaintiffs were not informed in the charging letter about the possibility of a civil money penalty in lieu of a disqualification, nor were they ever asked to submit any evidence that the six month disqualification would cause hardship to food stamp households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices. As discussed above, only when the disqualification is for trafficking do the regulations require that the charging letter inform the firm of its right to request that the FNS consider the sanction of a civil money penalty in lieu of a permanent disqualification and its right to submit evidence supporting its request for a civil money penalty in lieu of disqualification.

37. It is unclear, thus, what evidence, if any, was considered by the regional office in making its determination that the Plaintiffs were not eligible for the civil money penalty (CMP).

38. In real terms, this process makes the civil money penalty available only when there are no other authorized retail food store in the area *selling food.*

39. In these cases, therefore, the officer-in-charge/regional office level yields a predetermined result. The next level – the "Administrative Review Division" – is no different. An employee in that division -- called an administrative review officer -- makes the final agency decision. 7 U.S.C. § 2023(5); 7 C.F.R. § 279.1 *et seq.* The Secretary's regulations give the administrative review officer no more discretion in such cases than that accorded the officer-in-charge.

**D.   Judicial Review and the 1996 Elimination of the Automatic Stay**

40. Until 1996, the lack of a meaningful administrative adjudication process posed no problem to an innocent owner charged with a violation. The Food Stamp Act and the Secretary's regulations provided that the decision reached and penalty imposed by the regional office (the first stage of the process) would be automatically stayed upon a request for administrative review. 7 U.S.C. § 2023(a) (1996); 7 C.F.R. § 278.8(a) (1995).

41. As a result of the automatic stay, the administrative decisions, both initial and final, had no impact on a store charged with violating the Food Stamp Act until the administrative adjudication process had been completed. The decision of the administrative review officer became effective 30 days after receipt by the store. 7 U.S.C. § 2023(a) (1996); 7 C.F.R. § 279.8(g) (1995).

42. Within that 30-day period, however, the store could obtain *de novo* judicial review of the administrative decision by filing a complaint in a United States District Court or an appropriate state court. 7 U.S.C. § 2023(a) (1996). That action is "a trial *de novo* . . . in which

the court shall determine the validity of the questioned administrative action in issue." *Id*. Moreover, the court was given great discretion with regard to the appropriate remedy: "If the court determines that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence." *Id*.

43. The statute also specifically gave the court the power to stay the administrative action until conclusion of the trial or appeal, upon a showing by the store of (a) irreparable injury if no stay would issue; and (b) a likelihood of success on the merits. *Id*.

44. That judicial review procedure remains in place today with one critical exception: on August 22, 1996, Congress amended 7 U.S.C. § 2023(a) by eliminating the automatic stay in all cases in which disqualification is administratively imposed. 7 U.S.C. § 2023(a) (17) states, *inter alia* that "During the pendency of such judicial review, or any appeal therefrom, the administrative action under review shall be and remain in full force and effect, unless on application to the court on not less than ten days' notice, and after hearing thereon and a consideration by the court of the applicant's likelihood of prevailing on the merits and of irreparable injury, the court temporarily stays such administrative action pending disposition of such trial or appeal".

45. With the elimination of the automatic stay for such cases, the owner now feels acutely the deficiencies in the administrative process.

**E. The Administrative Proceedings Concerning Plaintiffs**

46. After receiving the May 11, 2011 charging letter, the Plaintiffs brought the matter to an accountant, a Mr. Luis Malave. He told her that, "I guess it's your turn now", "it was just a matter of time", "in his experience, they always take it away" (that is, disqualify) and that "it was better not to do anything at all".

47. As the Plaintiffs recognized that the acts complained of in the charging letter and the redacted investigative report had very likely occurred, she determined that there was no response which she could make to the allegations in good faith. She was not informed in the charging letter of the possibility that she could be eligible for a civil money penalty in lieu of a disqualification, nor did the charging letter request any evidence that might support a determination that she was eligible for a civil money penalty. Paradoxically, if she had been accused of trafficking, a much more serious offense, she would have had a real opportunity to demonstrate that she qualified for a civil money penalty in lieu of disqualification.

48. Thus, in her mind, lacking any good faith defense, the Plaintiffs did not reply to the charge letter. If Plaintiffs had received notice in the charging letter regarding the civil money penalty, and had been requested to submit evidence supporting its eligibility for a civil money, they would have submitted evidence establishing that, in fact, "the firm's disqualification would cause hardship to food stamp households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices..." 7 C.F.R. § 278.6(f)(1). Namely, the Plaintiffs would have submitted evidence establishing that they are the only authorized retail store in that area providing, at a reasonable price, healthy and nutritious food alternatives, including fresh fruits and vegetables, dried beans and seeds, and the only authorized retail store in that area providing certain ingredients vital to certain staple Mexican family food recipes.

49. On June 14, 2011, the FNS regional office, through the officer-in-charge, issued its decision in letter form. The regional office stated that (a) "We find the violations cited in our charge letter occurred at your firm"; and (b) "We have determined that you are not eligible for the CMP because there are other authorized retail stores in the area selling as large a variety of

staple foods at comparable prices; and (c) "your firm shall be disqualified from the Supplemental Nutrition Assistance Program for a period of six months".

50. It is unclear how the regional office arrived at its determination that the Plaintiffs were not eligible for the CMP "because there are other authorized retail stores in the area selling as large a variety of staple foods at comparable prices" No evidence was ever requested of Plaintiffs (as there would have been in the case of a permanent disqualification for trafficking), and there was no reference in the determination letter to any independently acquired evidence used by the regional officer in arriving at its determination. In fact, if the regional officer had made any real effort to independently acquire evidence regarding the firm's qualification for a civil money penalty, it might have discovered that the firm is the only authorized retail store in that area providing, at a reasonable price, healthy and nutritious food alternatives, including fresh fruits and vegetables, dried beans and seeds, and the only authorized retail store in that area providing certain ingredients vital to certain staple Mexican family food recipes.

51. Ms. Garcia submitted a timely request for review of the regional office decision, which was received by the FNS Administrative Review Branch on June 20, 2011. By letter dated June 29, 2011, she stated her position (in a letter drafted by her new accountant), explaining, *inter alia*, that:

> "My store has been open since October 2004 and we have been accepting food stamps continuously since then. I have been audited and checked several times through the years and until now there have never been any violations. Our record with the licensing authorities is very good. Due to a medical condition (see letter attached) I was unable to work and I had to allow an improperly trained employee to work the cash register. He is a good person and a very conscientious worker but when your examiner visited the store he had been working for only 2 weeks and I was not there to supervise him. In reviewing the violations I see his error and I have since made sure that he is fully aware of what is and what is not allowed to be purchase with food stamps. I therefore present to you that these mistakes will not occur again. I believe at this time and based on the previous lengthy good record the store has, that a warning would be in order, instead of the proposed six

month cancellation of SNAP participation. We are a minority owned and operated business located in a low income neighborhood and cancelling our participation in SNAP will endanger the store's survival given the poor continuing situation of the economy. We hire people from the community we serve and if our sales decrease (which will happen without SNAP) we will be hard pressed to keep them employed since over 75% of our inventory is SNAP related."

52. Consistent with the FNS practice and procedure, the administrative review officer affirmed the regional office's finding as to the violation and affirmed the sanction of a six month disqualification.

53. The administrative review officer made mention of the fact that the June 14th letter stated that consideration for eligibility for a hardship civil money penalty (CMP) was not applicable as there were other authorized retail stores in the area selling as large a variety of staple foods. The administrative review officer also cited 7 C.F.R. § 278.6(f)(1), which provides that the civil money penalty is available "as a sanction in lieu of disqualification when the firm subject to a disqualification is selling a substantial variety of staple food items, and the firm's disqualification would cause hardship to food stamp households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices...". Nevertheless, the administrative review officer did not independently address the question of whether or not civil money penalty should be applicable and whether or not there were other authorized retail stores in the area selling as large a variety of staple foods.

54. Moreover, it did not address any evidence regarding whether or not there were any authorized retail stores in the area selling as large a variety of staple foods as Plaintiffs nor does it appear that any such evidence was presented to it.

F.   Evidence Supporting a Determination that Plaintiffs are Eligible for a Civil Money Penalty

55.   A lack of access to healthy food causes serious hardships to citizens of East Harlem, a neighborhood considered to be a "food desert". According to an April, 2008 report prepared by the New York City Department of City Planning, East Harlem is an area of the city with the highest levels of diet-related diseases due to limited opportunities for citizens to purchase fresh foods.[1] With a high population density and a lack of nearby supermarkets, the neighborhood has little access to fresh fruits and vegetables and a low consumption of fresh foods. Citizens of East Harlem are likely to buy food from grocery stores that have a limited supply of fruits and vegetables, which are often of poor quality and generally more expensive than the same products sold at supermarkets.[2] Supermarkets in Harlem are 30 percent less common, and only 3 percent of local discount and convenience stores in Harlem carry leafy green vegetables as compared to 20 percent on the Upper East Side.[3] Without access to affordable produce and meats, East Harlem residents have difficulty eating a healthy diet, which contributes to high rates of obesity and diabetes.[4] A study published in the September 2004 issue of American Journal of Public Health found that diabetics in East Harlem have a much more difficult time finding healthy food than diabetics in the neighboring Upper East Side. Researchers at the Mt. Sinai School of Medicine compared 173 East Harlem and 151 Upper East Side grocery stores. The Harlem stores

---

[1] "Going to Market: New York City's Neighborhood Grocery Store and Supermarket Shortage", www.nyc.gov/html/dcp/html/supermarket/index.shtml.

[2] Ibid.

[3] NYC.gov

[4] Kimberly Morland, Ana V. Diez Roux, Steve Wing, Supermarkets, Other Food Stores, and Obesity: The Atherosclerosis Risk in Communities Study, American Journal of Preventive Medicine, Volume 30, Issue 4, April 2006, Pages 333-339.

were "much less likely to stock healthy food choices such as whole-grain breads and diet soda." The study found that "less than 20 percent of East Harlem grocery stores stocked the recommended list of five diabetes-friendly foods, compared with 58 percent of the Upper East Side stores."[5]

56.   A study by the National Housing Institute described the situation in East Harlem as follows:

> "The neighborhood, consisting largely of Latinos and African Americans, is home to a plethora of fast food restaurants, small bodegas with a scant amount of healthy food options and a few small local grocers. Public transportation exists, but residents who wanted to shop for moderately priced fruits and vegetables often had to travel up to one hour by bus to find a suitable grocery store, an option that was either difficult or impossible for seniors and women traveling with small children."[6]

57.   A report by the Rudd Center for Food Policy and Obesity at Yale University explains:

> As rates of overweight, obesity, and diet-related chronic diseases climb throughout the population, the Surgeon General as well as doctors and dietitians advise Americans to eat plenty of fresh, healthy, and unprocessed foods such as fruits, vegetables, and whole grains every day. However, *all Americans do not have equal access to these recommended foods.* Low-income people, minorities, and rural residents suffer the highest rates of preventable, diet-related diseases linked to insufficient consumption of healthy foods. Some reasons: Low-income areas have fewer supermarkets and groceries that carry healthy foods than do predominantly white, middle- and high-income neighborhoods.   Stores in low-income neighborhoods stock fewer healthy items and have significantly lower-quality fresh produce.   When available, the cost of fresh foods in low-income areas is often prohibitive.   Public transportation to supermarkets is often lacking. These and other factors combine to make it difficult for people living in low-income areas to take the steps recommended to maintain a healthy weight. Result: A public health problem with major costs and consequences. In response, communities around the country

---

[5] "Diabetics Face Fewer Healthy Food Choices in Some Urban Areas". W. K. Kellogg Foundation. Jan.   20,   2005.   http://www.wkkf.org/news/Articles/2005/01/Food-In-The-News-Diabetics-Face-Fewer-Healthy-Food-Choices-In-Some-Urban-Areas.aspx.

[6] Healthy Foods, Strong Communities, Rebecca Flournoy, National Housing Institute, Shelterforce Online, Issue #147, Fall 2006, www.nhi.org/online/issues/147/healthyfoods.html

have set a goal to bring healthy and affordable foods within easy reach of populations that normally cannot access them. *Policy makers are instrumental to the success of such a goal.*"

58. In response to these types of reports, there has been a concerted effort by policymakers and others to remedy the situation

59. For example, in late July 20, 2011 First Lady Michelle Obama announced a plan to team with grocers and other retailers to bring healthy and affordable food to communities that typically have not had access to fresh fruits and vegetables and other healthy foods.

60. The stated purpose of the Food and Nutrition Act of 2008 is:

"To strengthen the agricultural economy; to help to achieve a fuller and more effective use of food abundances; *to provide for improved levels of nutrition among low-income households* through a cooperative Federal-State program of food assistance to be operated through normal channels of trade; and for other purposes…" (emphasis added)

61. Ms. Garcia founded El Tepeyac Grocery with the goal of providing a healthy, nutritious, and affordable food alternative for families in the immediate area of the store. The store has over 4,000 products, most of which are imported from Mexico, and include ingredients for Mexican family recipes that cannot be found anywhere else in the vicinity. These foods are naturally pure, without chemical additives, with nutritional value, at prices accessible for the lower-income families who live the vicinity of the store. For example, the store sells, among other natural foods, seeds and beans, fresh fruits and vegetables that can be purchased with SNAP benefits, which one would be very hard pressed to find in that neighborhood and even some distance beyond.

62. The remaining stores in the neighborhood are stocked with pre-prepared foods, which have a high fat content and low nutritional value, and old fruits and vegetables (when they can be found).

63. Moreover, the remaining stores in the neighborhood commonly engage in trafficking, and despite pressure from her customers and from neighboring retail food stores, Plaintiffs have steadfastly refused to do the same.

64. In sum, El Tepeyac Grocery has, throughout her association with the Food Stamp program, acted as a good citizen and has made a unique, to her neighborhood, contribution to the stated purpose of the Food and Nutrition Act of 2008.

65. Unfortunately, the regulations did not provide her with reasonable notice of her ability to prove the same. They did not provide her with a reasonable opportunity to prove that her disqualification would cause a hardship to food stamp households because there is no other authorized retail store in the area selling as large a variety of staple food items at comparable prices, that is, healthy, nutritional foods at reasonable prices that are necessary for a healthy diet and irreplaceable for Mexican family meal recipes.

66. The United States Department of Agriculture erred in its determination that the Plaintiffs were not eligible for the civil monetary penalty because there are no authorized retail stores in the area selling as large a variety of staple foods at comparable prices, and the agency's method for determining eligibility for the CMP under this condition lacks transparency.


**COUNT I**
**(Trial de Novo Pursuant to 7 U.S.C. § 2023)**

67. Plaintiffs incorporate paragraphs 1 through 66 as if fully pleaded.

68. Under the provisions of 7 U.S.C. § 2023(a)(13)-(17), Plaintiffs are entitled to a trial *de novo* in this Court. The Court is to "determine the validity of the questioned administrative action in issue" and, if such action is invalid, the Court "shall enter such judgment or order as it determines is in accordance with the law and the evidence." 7 U.S.C. § 2023(a)(15), (16).

69. After all the proceedings contemplated by the statute, including the trial *de novo*, the Court should issue a judgment declaring that the final agency decision is set aside.

## COUNT II
**(The Secretary's Wrongful Disqualification of the Plaintiffs from Eligibility for a Civil Money Penalty in Lieu of a Six Month Disqualification)**

70. The Plaintiffs incorporates paragraphs 1 through 69 as if fully pleaded.

71. Under 7 U.S.C. § 2021(a), "Any approved retail food store or wholesale food concern may be disqualified for a specified period of time from further participation in the food stamp program, or subjected to a civil money penalty of up to $10,000 for each violation if the Secretary determines that its disqualification would cause hardship to food stamp households, on a finding, made as specified in the regulations, that such store or concern has violated any of the provisions of this chapter or the regulations issued pursuant to this chapter". The Secretary, however, has refused to exercise the discretion mandated by Congress and has promulgated regulations that directly contravene the letter and the spirit of the statutory provision.

72. The regulations in question do not provide a reasonable opportunity for a firm accused of a violation other than trafficking to submit evidence supporting its eligibility for a civil money penalty in lieu of a disqualification. The unfairness of the regulations is exacerbated by the failure of the Secretary to provide a meaningful framework for the proper and evidence-based consideration of a firm's eligibility for a civil money penalty in lieu of a disqualification by the regional office or administrative review officer, and by its preferential treatment for firms charged with trafficking.  The Secretary has also failed to consider an important aspect of the regulations:  their negative and harsh impact on small stores, which typically do not have company counsel to advise them regarding their eligibility for a civil money penalty.

73. The regulations contravene the express intent of Congress, are manifestly contrary to the statute, and are, therefore, invalid. The regulations also violate the Fifth Amendment's due process guarantee, for they are not sufficiently related to any legitimate state interest, are gravely unfair and drastic, flout the law, and trammel upon important property rights. Finally, the regulations are arbitrary, capricious, and otherwise contrary to law.

**COUNT III**
**(The Secretary's Unlawful, Arbitrary, and**
**Capricious Computation of the Civil Money Penalty)**

74. Plaintiffs incorporate paragraphs 1 through 73 as if fully pleaded.

75. The formula contained in the Secretary's regulations for the computation of the civil money penalty, 7 C.F.R. § 278.6(g), is contrary to both the statute and Congress' intent to give stores access to Secretarial discretion. The formula is another example of the Secretary's hostile attitude toward the alternative money sanction that Congress enacted in 1988. The formula is, in fact, designed to guarantee that every unknowing first offender will incur the statutory maximum $54,000 penalty.

76. In addition to being manifestly contrary to the statute and congressional intent, the regulations containing the formula are arbitrary, capricious, and otherwise contrary to law.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray for judgment against defendants and asks this Court to:

1. issue a temporary stay of the Secretary's six month disqualification of the Plaintiffs from the food stamp program, upon application to be made pursuant to 7 U.S.C. § 2023(17);

2. issue a judgment that (a) sets aside the final agency decision; (b) declares the Secretary's regulations governing the form of the charge letter and the process for determining eligibility for the civil money penalty in lieu of disqualification to be manifestly contrary to the

statute and the Fifth Amendment's guarantee of due process, and to be arbitrary, capricious, and otherwise unlawful; and (c) declares the Secretary's regulations governing computation of the civil money penalty to be manifestly contrary to the statute and the Fifth Amendment's guarantee of due process, and to be arbitrary, capricious, and otherwise unlawful; and (d) imposes a reasonable penalty consistent with the statute and the Constitution;

     3.    award the Plaintiffs attorney's fees, disbursements, costs, and interest; and

     4.    grant the Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:       August 18, 2011
Jackson Heights, N.Y.


A. David Fuster, II
(#2999001)
Fuster Law, P.C.
31-10 37th Avenue
Suite 401
Long Island City, NY 11101
(347) 642-4486
(866) 477-0735 (fax)

Counsel for Plaintiff